# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**UNITED STATES OF AMERICA,**

v.  CRIMINAL ACTION NO. 1:07cr111

**MAURICIO MICHEL,**
        **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

On the 11th day of February, 2008, came the defendant, Mauricio Michel, in person and through counsel L. Richard Walker, and also came the United States by its Assistant United States Attorney, Andrew R. Cogar, for a hearing on Defendant's Motion to Suppress Alleged Statements [Docket Entry 12].

The undersigned received the testimony of FBI Special Agent James Watson and Special Investigative Agent Brian Antonelli.

## Procedural History

Defendant Michel was indicted by a grand jury attending the United States District Court for the Northern District of West Virginia on November 6, 2007. The indictment charges him with using a dangerous weapon and knowingly and forcibly assaulting an employee of the United States Department of Justice, Bureau of Prisons, while the employee was engaged in his official duties as a corrections officer; and knowingly and forcibly resisting, opposing, and impeding employees of the Bureau of Prisons. Defendant was arraigned on December 13, 2007, at which time he pled not guilty to the charges.

## Facts

The undersigned finds the following testimony and evidence credible, and therefore

recommends these findings of fact:

On August 31, 2007, at approximately 4 p.m., FBI Special Agent James Watson received a telephone call from Special Investigative Agent Brian Antonelli at USP Hazleton, informing him that Correctional Officer Jeremy Sparks had been stabbed by an inmate and FBI assistance was needed. SA Watson left immediately and believed he arrived at Hazleton at approximately 4:50 or 5:00 p.m. He parked and went in a side door of the facility and met SIA Antonelli. The two walked down a hallway to a common area. They showed identification, and then walked into the yard, across, and into the main lock-up. They then proceeded to a corridor within which was the Lieutenant's office. In the Lieutenant's office were two holding cells. Defendant was being held in one of the cells.

The door to the holding cell was opened by an officer and SA Watson went inside, introduced himself showing Defendant his ID, and said to Defendant, "What's up?" Defendant stated: "The officer's been f**king with me." SA Watson thought Defendant had made a statement, and therefore pulled out an "Advice of Rights" card from his wallet. Defendant was sitting on the floor with his hands cuffed in front. SA Watson was also sitting on the floor. He had a card issued by the FBI which he had carried for approximately 15 years. He did not have an official "Advice of Rights" form with him because he had left immediately upon being called and did not stop to retrieve one.

SA Watson put his wallet on the floor between his legs and read from the card to Defendant. He read each right and then asked if Defendant understood. When Defendant said, "Yes," SA Watson went on to the next right, until he had covered all of them. When he was finished, he asked Defendant if he wanted to continue talking, and Defendant said, "Yes." Defendant then made

2

several statements. He was asked if someone "green lighted" the attack on Officer Sparks, to which Defendant replied that he "made his own" green lights and didn't need one from anyone else. He also stated that the officer had disrespected his "house," and had also shown disrespect for him by not giving him his hygiene/personal articles. He also said, "everything builds up and then boom." SA Watson believed these statements were admissions.

During the hearing SA Watson took out his copy of the "Advice of Rights" card, testifying that it was the same one he used on the day in question. He read the rights from the card. SA Watson testified that no demands or threats were made at any time by any one that he was aware of. Defendant did change his mind after making several statements, saying he did not want to talk anymore. The questioning stopped at that point.

SA Watson testified that he specifically recalled reading each right to Defendant and Defendant's response. He rarely needed to read an individual his rights from the card, because he usually had his form with him. He had probably used the card itself only once or twice a year. On this occasion, however, he was called in and did not have his paperwork with him. He testified that when he needed to use the card it was a "memorable occasion." He also testified that Defendant kept working at his hand cuffs, although he did not appear to be in pain. Instead, he seemed very upset with the guard who had been attacked. It appeared that the disrespect shown by the guard was very important to Defendant. Defendant did not appear to have been injured. He did not ask if Defendant had been injured, and he did not ask if Defendant had been to the dispensary. He understood everyone involved in an altercation was sent to the dispensary, however. Defendant did not appear to have any mental or emotional problems, and SA Watson testified he was not aware of any. He was not aware of any mental health crisis or episode. Defendant did not look like he had

3

a mental health or emotional problem– he just looked upset and angry. He was not crying.

SA Watson asked about the "green light" because he believed Defendant was a member of an organization, "Surenos," and would need authority to do what he did. The Surenos were known as a "Specific Threat Group" (STG"). SA Watson did not confirm that Defendant was a member of any organization or group, however.

SA Watson testified that the question, "What's up?" was meant merely as an icebreaker. He expected nothing in particular in response. When Defendant responded "the officer was f**king with him, it dawn on him that Defendant had made a statement, and took out the card to read Defendant his rights. No other questions were asked before he read him his rights. He never raised his voice and did not recall Antonelli raising his. He did recall some banter between Defendant and Antonelli regarding the prisoner not knowing who Antonelli was. Defendant did not say that he had been beaten up by anyone prior to SA Watson getting there. Defendant just started talking. He appeared agitated and so upset with the officer, that he just wanted to tell somebody.

SA Watson testified that Defendant said he understood all his rights as they were read to him, and then said he wanted to talk. He had no doubt that Defendant understood and volunteered to answer questions.

SIA Antonelli testified that on August 31, 2007, shortly before 4:00, the alarm went off in the facility. When he arrived where the assault had taken place he saw Defendant being wheeled out on a gurney in restraints for transport, and Officer Sparks lying in the hallway. The area had been cleared and secured as a crime scene. He then called SA Watson, who arrived just less than an hour later. He was watching video surveillance footage of the event when SA Watson arrived. They went first to Health Services but there was no update on Officer Sparks. They then went to

the Lieutenant's Office area, where Defendant was being held in one of the two holding cells. They walked in and saw Defendant sitting on the floor with his hands cuffed in front of him. Defendant appeared "pretty amped up" - - not violent, but looking like he had been in a fight. SIA Antonelli testified that "Jim" [SA Watson] said, "What's up?" and Defendant said "officer's been (messin') with me."[1] SA Watson was sitting on the floor and pulled out an old brown wallet. He then pulled a little card out of the wallet and read from it. Antonelli did "banter" with Defendant, asking if he knew who he [Antonelli] was, but did not recall if that was before or after he was read his rights.

SIA Antonelli's main concern at that time was that there may have been something "bigger" going on than the assault by one inmate on one officer. He had noticed tattoos on Defendant that appeared to be Sureno tattoos. Watson did the questioning, however, and the questions, except for "what's up," were asked after Defendant was read his rights and said he understood. SIA Antonelli testified he had no doubt that Defendant understood. Defendant appeared almost cocky. There were no threats – if anything, Antonelli was trying to keep things calm. Defendant was flexing in his cuffs, and Antonelli wasn't sure if he was trying to slip them off, so he was trying to keep Defendant calm. There was no discussion of possible consequences. At the end of the questioning, he informed Defendant that he would be transported to another facility. No one raised his voice. They were trying to keep things calm.

SIA Antonelli testified that Defendant had no obvious injuries and did not request medical attention. He was evaluated, but did not complain of injury. He seemed to have what was more like an adrenaline rush– like someone just in a fight and "ready to go." He did not seem as upset as he

---

[1] The undersigned notes that various words or abbreviations were used in place of the alleged statement.

seemed cocky. SIA Antonelli testified he had no information regarding Defendant having any mental health issues. He seemed quite normal. There was no hint or suspicion that Defendant had any mental health problem or issue. He seemed quite intelligent.

Defendant gave some sort of affirmative response to the question of whether he understood his rights and wanted to talk. Nothing stuck out in the conversation that would imply he did not understand or did not want to proceed, although SIA Antonelli testified he could not say specifically that Defendant was asked both whether he understood, and separately, whether he wanted to talk. He just said, "yes," and started talking.

Defendant relies on his version of the facts as recited in his Motion. Defendant first states that he was not provided with his rights until after he made all of the alleged statements. He also contends his statements were not voluntary – that the agents told him if he did not talk, they would "bury him," and that if he did talk, they would not charge him. They told him that if he did not talk, they would come after him and "get him for everything."

## **Contentions of the Parties**

Defendant argues:

1) He was not provided with his rights pursuant to <u>Miranda v. Arizona</u>, until after all of the questioning and after he made all of the alleged statements; and

2) His statements were not voluntary.

The Government argues:

1) The statement, "What's up?" was an informal, slang greeting and was not a question which would reasonably evoke an incriminating statement;

2) After Defendant's initial response to the greeting, "What's up?" SA Watson informed

6

Defendant of his Miranda rights, and Defendant waived those rights; and

3) The officers respected Defendant's rights and stopped the interview when Defendant stated he no longer wished to talk.

**Discussion**

Miranda warnings are required when a subject is interrogated while in custody. Miranda v. Arizona, 384 U.S. 436, 16 L.Ed. 2d 694, 86 S. Ct. 1602 (1966). Here it is undisputed that Defendant was in custody at the time he made the alleged statements to SA Watson and SIA Antonelli. He was therefore entitled to Miranda warnings before being interrogated. Statements volunteered by a defendant while he is in custody, however, are not implicated by Miranda. "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility [is not implicated by Miranda]." Rhode Island v. Innis, 446 U.S. 291, 300, 64 L.Ed. 2d 297, 100 S.Ct. 1682 (1980). Further, the Fourth Circuit held that casual conversation or statements of agents about evidence which were not designed to elicit an incriminating response are not "interrogation" for Miranda purposes. See United States v. Payne, 954 F.2d 199 (4th Cir. 1992).

The undersigned finds SA Watson and SIA Antonelli's testimony credible and corroborated each by the other. The undersigned therefore finds that, consistent with the testimony, SA Watson's greeting, "What's up?" was meant as an icebreaker, a type of casual conversation. The greeting was not meant to elicit an incriminating response, and SA Watson's credible testimony was that Defendant's response was unexpected. SA Watson reacted to the response by pulling out his wallet and retrieving his "advice of rights" card to inform Defendant of his Miranda rights.

Assuming Miranda applies, as it does in this case, a subject may nevertheless waive his rights

7

and voluntarily submit to custodial interrogation. The undersigned finds the testimony of SA Watson credible, and finds that he did read Defendant his Miranda rights from a card he carried in his wallet. He read each right separately, and asked if Defendant understood each one. Defendant responded, "yes," to each question. After reading Defendant each of his rights separately, SA Watson then asked him if he understood his rights and agreed to talk, to which Defendant responded in the affirmative. Defendant contends there is a question whether the affirmative response to the question phrased in the conjunctive meant that Defendant both understood his rights AND agreed to talk. To be valid, the waiver "need not be explicit, but may be inferred from all the circumstances." United States v. Hicks, 748 F.2d 854, 859 (4th Cir. 1984). From the totality of the circumstances, the undersigned finds Defendant did affirm that he both understood his rights and agreed to talk. In particular, as the credible testimony indicates, Defendant stated he understood each separate right; then answered "yes," when asked if he understood all his rights and agreed to talk; and then did begin talking after his rights were read to him. After a short time, he indicated he no longer wanted to talk, which further shows he knew and understood his rights and had voluntarily waived them up to that point. When he indicated he no longer wished to talk, the questioning ceased.

      Defendant also contends his statements were not voluntary because the agents advised him that if he did not talk, they would "bury him;" that if he did talk they would not charge him; and that if he did not talk, the agents would come after him and "get him for everything." "A statement is involuntary under the Fifth Amendment only if it is involuntary within the meaning of the Due Process Clause." United States v. Braxton, 112 F.3d 777, 780 (4th Cir. 1997). For a statement to be involuntary under the Due Process Clause, it must be "extracted by . . . threats or violence;" or

"obtained by . . . direct or implied promises; " or " the exertion of . . . improper influence." Id. In determining voluntariness, the crucial inquiry is whether the subject's will has been "overborne" or his "capacity for self-determination critically impaired." United States v. Pelton, 835 F.2d 1067, 1071-1072 (4th Cir. 1987). A condition precedent to a finding of involuntariness is coercive government conduct. Colorado v. Connelly, 479 U.S. 157, 165, 93 L.Ed.2d 473, 107 S. Ct. 515 (1986).

First, the undersigned finds credible SA Watson's and SIA Antonelli's testimony, each corroborated by the other, that there was no coercion, no threats were made, and voices were not raised. Even if the statements claimed by Defendant had been made, however, in determining voluntariness of a statement, the court examines "the totality of the circumstances," including the defendant's individual characteristics and background, the setting in which the statement occurred, and the details of the interrogation or interview. United States v. Elie, 111 F.3d 1135, 1143-1144 (4th Cir. 1997). To be voluntary, the circumstances surrounding the interrogation or interview need not be entirely free from intimidation. Braxton, supra, at 780-782. Rather, "[t]ruthful statements about [the defendant's] predicament are not the type of coercion that threatens to render a statement involuntary." Id. See also United States v. Mashburn, 406 F.3d 303, 309-310 (4th Cir. 2005)(advising defendant of penalties he faced if convicted and telling him the only way he could help himself was to accept responsibility and cooperate was not impermissible "implied threat/promise," rendering subsequent statements involuntary). The Fourth Circuit has also held that "warnings" by agents that a defendant would "face five years" was not sufficiently coercive to render subsequent statements involuntary. Braxton, supra, at 781-783. Nor must inculpatory statements be suppressed merely because a defendant was promised leniency and now subjectively believes his confession was

9

"involuntary." United States v. Shears, 762 F.2d 397, 401-401 (4th Cir. 1985). It is entirely proper, for example, for an agent to discuss potential cooperation with a defendant, and to promise to make known to the prosecutor the extent of cooperation. Id. Nor does the fact that a subject is placed in handcuffs ipso facto render any subsequent statement "involuntary." Elie, supra at 1145-1146.

Although Defendant's counsel asked for additional time to explore whether Defendant had mental health or emotional issues that might affect the voluntariness of his statements, he has, to date not produced any evidence of any such impairment. Further, the credible testimony was that, although Defendant appeared upset and angry about the Officer Sparks' actions and disrespect toward him, he did not raise his voice or act violently during the questioning. He appeared to want to tell someone how he had been treated by Officer Sparks. He did not appear to be mentally or emotionally impaired, and neither agent had any knowledge that Defendant actually had any mental or emotional problems.[2]

Under the "totality of the circumstances," the undersigned therefore finds that Defendant's will was not "overborne" or his "capacity for self-determination critically impaired." United States v. Pelton, 835 F.2d 1067, 1071-1072 (4th Cir. 1987).

For all the above reasons, the undersigned finds that Defendant's statements were voluntary and were not obtained in violation of his Constitutional rights.

## RECOMMENDATION

For the reasons herein stated, it is **RECOMMENDED** that Defendant's Motion To Suppress Alleged Statements [Docket Entry 12], be **DENIED**.

---

[2]This finding is solely for the purpose of this suppression hearing, and the undersigned makes no findings regarding Defendant's mental state for any other purposes in this matter.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 11th day of February, 2008.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE